FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA 00 FEB -3  PM 2: 33
SOUTHERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

MORRIS PLAISANCE,

      Plaintiff,

vs.                                                    CASE NO. CV-99-J-1527-S

WILLIAM PERRY, SECRETARY,
DEPARTMENT OF DEFENSE,

      Defendants.

ENTERED

FEB   3 2000

## MEMORANDUM OPINION

Currently pending before the court is the defendant's second motion to dismiss or

in the alternative, motion for summary judgment (doc. 17) and defendant's memorandum

in support of its motion.  The defendant has also filed the entire administrative record of

the proceedings below.  The plaintiff has filed a brief in opposition to the defendant's first

motion to dismiss.  The court heard oral argument on the second motion to dismiss on

December 14, 1999.  The court has considered the written and oral arguments of the

parties and reviewed the entire administrative record.

### I.  Procedural Background

The plaintiff filed this suit as "an action brought under Title VII of the Civil Rights

Act as amended and the Constitution of the United States for damages arising from

defendant's intentional violation of the plaintiff's constitutional and civil rights and under

the Civil Service Reform Act."  Complaint at ¶ 1.  The defendant filed a motion to dismiss

(doc. 17) alleging that the administrative findings are supported by substantial evidence and thus this court should dismiss this case. The decision from which the plaintiff appealed was entered July 23, 1998. No allegation is raised by the defendant that the plaintiff has failed to exhaust his administrative remedies or that he failed to follow the proper procedure to bring this Title VII claim in Federal District Court. This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

## II. Factual Background

The facts leading to the filing of this case constitute a lengthy series of events beginning sometime in 1994 and culminating with the plaintiff's termination on October 12, 1996, after being removed from the premises of his employer and placed on administrative leave on June 24, 1996. Defendant Exhibit C at ¶ 15, Exhibit E at ¶ 15. The plaintiff was employed with the defendant as a contract administrator at the GS-11 level. Defendant Exhibit C. The plaintiff alleges that the defendant has an improper bias favoring female employees and that he was retaliated against through his termination for reporting the misuse of government property, as well as other protected activity.

A strong animus between the plaintiff and a female employee, Jan Bishop, is apparent from a review of the administrative record. After several years of accusations being leveled by each of them at the other, on March 18, 1996, the plaintiff filed an EEO claim alleging discrimination against him on the bases of sex, disability and disparate treatment. Defendant Exhibit E at 1. The plaintiff filed a second EEO complaint on March 27, 1996 for the same

2

grounds as well as the additional grounds of reprisal. Defendant Exhibit E at 2. On March 19, 1996, Ms. Zealy, a secretary with the defendant, alleged that the plaintiff assaulted her by grabbing her wrist although two other employees less than ten feet away from plaintiff and Zealy stated under oath that they heard nothing to draw their attention to where the plaintiff and Zealy were. Hearing record ("H.R.") at 338, 347, 351. No evidence of the plaintiff causing any injury to Zealy was submitted. See defendant Exhibit E at ¶ 16a, H.R. 350-351.

The plaintiff was allegedly told on March 21, 1996 and March 25, 1996 by Irvin Jackson, the plaintiff's supervisor, to stay away from Zealy. H.R. 342, 360. The plaintiff filed a third EEO complaint on May 10, 1996, alleging that his performance appraisal was downgraded due to reprisal for his EEO claims. Meanwhile, Zealy and Bishop made allegations against the plaintiff that he threatened them. June 24, 1996, defendant Exhibit C at ¶¶ 4 and 16a.

The plaintiff filed a fourth EEO complaint on June 27, 1996 alleging sex and reprisal discrimination in being escorted off of the job and placed on leave. Defendant Exhibit E at ¶ 7. The plaintiff was informed on July 19, 1996 that he was going to be fired for sexual harassment, conduct unbecoming a federal employee, rude conduct and failure to follow instructions. The plaintiff in response alleged he was being terminated for sex discrimination/gender bias, reprisal for whistle blowing, filing a grievance and for filing a discrimination complaint. Plaintiff's appeal at 2.

3

The plaintiff also filed an Office of Special Counsel complaint on January 6, 1996 based on his non-selection for a GS-13 position and an Office of Special Counsel complaint on May 28, 1996 regarding reprisal harassment.

The plaintiff appealed his termination to the Merit Systems Protection Board ("MSPB"), which affirmed the removal of the plaintiff on July 23, 1998. Defendant's Exhibit Q. The MSPB administrative judge ("AJ") found the numerous complaints by Bishop and Zealy against the plaintiff to constitute sexual harassment. For example, the AJ found that the plaintiff asking Bishop when she got married and how old was her oldest child, as well as making a comment about Baptists constituted sexual harassment.[1]  This court considers solely the propriety of the decision of the AJ at this time and specifically does not consider the merits of plaintiff's discrimination claim, which will be tried *de novo*.

### III. Standard of Review

Under 5 U.S.C. § 7703 of the Civil Service Act, this court may reverse a decision of the AJ if this court finds that the agency actions were arbitrary, against the substantial evidence or against procedures required by law. Claims brought by the plaintiff under this code section other than discrimination claims are reviewed on the administrative record. *See*

---

[1]Interestingly, these comments were allegedly made to Bishop in November or December 1994, but not the subject of an EEO complaint by Bishop until March, 1996. H.R. 215-218. The court notes that this is the same time frame during which Bishop states that she was being investigated for misreporting of her time, etc., due to what she believed to be the plaintiff's reporting of her and theft of her time sheets. Of course, the plaintiff denies stealing Bishop's time sheets. Defendant's Exhibit E at ¶ 17 and page 13.

4

*Williams v. Rice*, 983 F.2d 177, 180 (10th Cir. 1993); *Bullock v. Widnall, et al.*, 953 F.Supp.

1461 (M.D.Ala.1996); *aff'd* 149 F.3d 1196 (11th Cir. 1998); *Douglas v. Veterans*

*Administration*, 5 MSPB 313, 5 M.S.P.R. 280, 287-288 (1981).

> 5 U.S.C. § 7702 contains the statutory provisions directly addressing the
> procedural path of a mixed case – an adverse personnel action subject to
> appeal to the MSPB coupled with a claim that the action was motivated by
> discrimination. *See e.g. McAdams v. Reno*, 64 F.3d 1137, 1141 (8th Cir.1995)
> (other citations omitted)....
>
> When the complainant appeals to the MSPB, either directly or after pursuing
> [his] claim with the agency EEO office, the matter is assigned to an
> Administrative Judge who takes evidence and eventually makes findings of
> fact and conclusions of law (citations omitted). The AJ's initial decision
> becomes a final decision if neither party, nor the MSPB on its own motion,
> seeks further review within thirty-five days (citations omitted). However, both
> the complainant and the agency can petition the full Board to review an initial
> decision. Should the Board deny the petition for review, the initial decision
> becomes final .... At this point the complainant again has a choice: within
> thirty days of receiving a final decision from the MSPB, [he] can either appeal
> the discrimination claim to the EEOC (citation omitted) or appeal the entire
> claim (or any parts thereof) to the appropriate district court (citations omitted).

*Butler v. West,* 164 F.3d 634, 638-639 (D.C.Cir. 1999). *See also Downey v. Runyon*, 160

F.3d 139 (2nd Cir. 1999). Thus, this court has reviewed the entire administrative record to

determine whether the decision of the MSBP judge on the issues of improper termination,

retaliation for whistleblowing and engaging in prohibited personnel practices is supported

by substantial evidence in the record and not arbitrary or capricious. 5 U.S.C. § 7703; *Carr*

*v. Social Security Administration,* 185 F.3d 1318, 1321 (Fed. Cir. 1999); *Pope v. U.S. Postal*

*Service,* 114 F.3d 1144, 1147 (Fed. Cir. 1997); *Hartman v. MSPB*, 77 F.3d 1378 (Fed. Cir.1996); *Rana v. U.S.,* 812 F.2d 887, 888,  n.1 (4th Cir. 1987).

The agency must establish three things to withstand challenge to an adverse action against an employee. "First, it must prove, by a preponderance of the evidence, that the charged conduct occurred.  5 U.S.C. § 7701(c)(1)(B) (1994).  Second, the agency must establish a nexus between that conduct and the efficiency of the service.  5 U.S.C. § 7513(a) (1994); *Hayes v. Department of Navy*, 727 F.2d 1535, 1539 (Fed. Cir.1984).  Third, it must demonstrate that the penalty imposed is reasonable.  *See Douglas v. Veterans Admin.*, 5 MSPB 313, 5 M.S.P.R. 280, 306-07 (1981)."  *Pope*, 114 F.3d at 1147.

Under the Whistle Blower Protection Act, 5 U.S.C. § 2302(b)(8), an employer may not reprimand or terminate an employee for reporting violations or gross mismanagement. In a Whistleblower Protection Act claim, the plaintiff must prove, by a preponderance of the evidence, that the fact of the protected disclosure was a factor that tended to affect in any way the personnel action.  To meet this burden, the plaintiff may show the disclosure was a contributing factor through circumstantial evidence that (a) the official taking the personnel action knew of the disclosure and (b) it was in close proximity to the time of the disclosure. See 5 U.S.C. § 1221(e)(1); *Carr,* 185 F.3d at 1322; *Kewley v. Dept. of Health and Human Services*, 153 F.3d 1357, 1361 (Fed. Cir.1998) (called the "knowledge/timing" test).  If the plaintiff meets this burden, the defendant must then show, by clear and convincing evidence,

that the personnel action would have been taken even in the absence of the protected disclosure. *Marano v. Department of Justice,* 2 F.3d 1137 (C.A.Fed.1993).

The legal standard for the plaintiff to establish a prima facie case of retaliation for filing an EEO complaint or grievance is essentially the same as a retaliation for whistle blowing claim, that being, (1) he engaged in protected activity; (2) the accused official knew of the protected activity; (3) the adverse employment action under review could, under the circumstances, have been retaliation; and (4) there was a genuine nexus between the retaliation and the adverse employment action. Initial Decision at 47, citing *Cloonan v. United States Postal Service*, 65 M.S.P.R. 1, 4 (1994). To establish a genuine nexus, the plaintiff must show that the employment action was taken because of the protected activity. *Id*. at n. 3.

To withstand the challenge to its termination of the plaintiff, the agency has to establish (1) by a preponderance of the evidence that the charged conduct occurred; (2) a nexus between the conduct alleged and the efficiency of service; and (3) that the penalty imposed is reasonable. *See Pope*, 114 F.3d at 1147 (citations omitted). Precedent exists for the assumption that, once the charged misconduct is proven, a presumption exists that the proven misconduct harms the efficiency of service. *Id*. Oddly, here neither the agency or

the AJ made any allegation, finding or supposition that the efficiency of service was in any way affected by the plaintiff's alleged behavior.[2]

## IV. Legal Analysis

The defendant argues that because the AJ made meticulous findings of fact in support of the decision to terminate the plaintiff, these findings should be entitled to great deference. However, as explained in depth below, this court finds the record to be lacking in evidence to support the AJ's meticulous findings.

The AJ found the plaintiff was removed on four charges: (1) sexual harassment (as defined under DLAR 1406.1 Charge #27); (2) conduct unbecoming a federal employee; (3) failure to follow instructions; and (4) rude conduct. Initial Decision at 2.

The plaintiff alleges the AJ's application of the agency's regulation definition of sexual harassment rather than that found in Title VII is in error. The definition applied was "deliberate or repeated unsolicited verbal comments, gestures, or physical contact of a sexual nature which are unwelcome. It is also implicit or explicit coercive sexual behavior to control, influence, or to affect the career, salary, or job or (sic) a subordinate or other employee." Initial Decision at 3.

The agency alleged that no single incident, but rather the plaintiff's "long pattern of harassment of females over several years constitutes a hostile work environment and sexual

_____

[2]As stated *infra,* the AJ did find that the *Pope* case was not applicable to her, although this court finds it is binding precedent on the MSPB.

8

harassment and will not be tolerated." Initial Decision at 3. The AJ found from this charge that the plaintiff was not accused of creating a hostile work environment. Id. The AJ concluded that to sustain its charge, the agency had to prove the plaintiff "made deliberate or repeated unsolicited verbal comments, gestures or physical contact of a sexual nature which are unwelcome." Initial Decision at 3-4.

## A. The Whistle Blower's Retaliation Claim

The AJ cited three disclosures by the plaintiff as the basis for his allegation of retaliation for whistleblowing. These are: (1) repeated complaints before December, 1994 that Ms. Bishop used a government car for personal use; (2) filing an Office of Special Counsel ("OSC") complaint on January 19, 1996 based on his non-selection for a GS-13 position and (3) a May 28, 1996 OSC complaint regarding reprisal harassment.

The Whistle Blower Protection Act prohibits taking a personnel action with respect to any employee because of any disclosure of information which the employee reasonably believes evidences a violation of any law, rule or regulation or gross mismanagement, a gross waste of funds, or an abuse of authority. 5 U.S.C. § 2302(b)(8). The whistle blower must evidence only that his protected disclosure played a role in, or was a "contributing factor" to the personnel action taken. *Marano v. Department of Justice*, 2 F.3d 1137, 1140 (Fed. Cir.1993). "Contributing factor" is a factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision. *Id.;* citing 135 Cong.Rec. 5033 (1989).

The defendant argues that Colonel Pulscher, the official who removed defendant from his position, had no knowledge of number two or three, above. Pulscher testified that he learned of number one during the EEO process. However, the EEO process stemmed from the plaintiff's filing of a formal complaint in February, 1996 alleging sex discrimination. This was followed by a February 20, 1996 letter to Pulscher from Hauschild stating that the plaintiff's allegations of disparate treatment appeared to be correct.[3] Plaintiff exhibit 18 in defendant exhibit F. This court disagrees with the AJ's failure to list this incident as a basis to support plaintiff's allegation of whistle blowing. By failing to find support in this incident for plaintiff's allegation of retaliation for whistle blowing, the AJ acted arbitrarily and capriciously. Furthermore, the evidence submitted to this court demonstrates that Ms. Bishop was investigated for the alleged unauthorized use of a government vehicle in March, 1996, not in 1994 as the AJ states.[4] Thus, the finding by the AJ that plaintiff failed to prove his whistle blowing activities played any part in Pulscher's termination of the plaintiff is not supported by the evidence.

The substantial evidence in the case demonstrates that Pulscher knew of the plaintiff's disclosure and this disclosure was in close proximity (three to four months) prior to the

---

[3]John R. Hauschild is an Equal Employment Opportunity counselor with defendant.

[4]Jan Bishop was a co-employee of plaintiff whom plaintiff believed was fraudulently reporting her time, attendance and government vehicle usage.

plaintiff's termination. The plaintiff met his burden of proof under the knowledge/timing test. *Kewley*, 153 F.3d at 1361.

The burden thus shifts to the defendant to come forward with clear and convincing evidence that the personnel action would have been taken even in the absence of the protected disclosure. *Marano,* 2 F.3d at 1141; citing 5 U.S.C. §§ 1214(b)(4)(B)(ii) & 1221(e)(2). This court finds that the agency failed to meet this burden. Supporting this finding is the questionable credibility of Pulscher's testimony as well as the fact that Pulscher used an incident found by both this court and the AJ below to be completely blown out of proportion. *See* Zealy's claim that plaintiff asked her if she was getting on the elevator in June, 1996, discussed *infra*. Pulscher's testimony that he had no knowledge of the plaintiff's protected activity is wholly unbelievable.

Further, the AJ found that Siegel was not aware of the plaintiff's filing of the January 19, 1996 OSC complaint or the May 28, 1996 OSC complaint, but may have been aware of the plaintiff's repeated complaints that Ms. Bishop used a government car for personal use.[5] While the defendant argues this is too remote under the knowledge/timing test, this court finds that Ms. Bishop's car use was investigated in 1996, not in late 1994 as the AJ found, thus supporting the plaintiff's allegations of retaliation for whistle blowing. *See e.g.,* H.R. 236.

_____

[5]Hank Siegel was Chief of the DCMO South office. The AJ found that Bishop had spoken with Siegel in December 1994 about her concerns with the plaintiff. Initial decision at 45.

11

The defendant does argue that the plaintiff would have been terminated even if he had not engaged in whistle blowing activity. Whether the defendant has shown by clear and convincing evidence that it would have taken the personnel action at issue without the plaintiff's protected disclosure is determined by a three part test:

(1) the strength of the agency's evidence in support of its action;

(2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and

(3) evidence the agency takes similar actions against employees who are not whistle blowers but who are otherwise similarly situated.

*Carr v. Social Security*, 185 F.3d 1318, 1323 (Fed. Cir.1999); citing *Geyer v. Department of Justice*, 70 MSPR 682, 688, *aff'd* 116 F.3d 1497 (Fed. Cir. 1997). The defendant supports its conclusion that the plaintiff would have been terminated even if he had not engaged in the protected activity by alleging that the record is replete with evidence to support a finding that the plaintiff engaged in numerous acts of sexual harassment, rude conduct and conduct unbecoming a federal employee. This court can find no evidence, substantial or otherwise, to support the defendant's claim that the plaintiff engaged in numerous acts of sexually harassing activity.

Under the test in *Carr,* this court finds that the defendant has extremely weak evidence in support of its claims of sexual harassment, that Bishop had a strong motive to retaliate against the plaintiff and that Zealy and Bishop are close friends.[6] Pulscher testified

---

[6]Nancy Zealy was the secretary to Robert Pacheco during the time in question. H.R. 557.

12

the defendant has never had a similar complaint and therefore no similar action has been taken by the defendant. The evidence shows that Pulscher was in charge of the Birmingham office and learned of plaintiff's reporting of Bishop's activities. *See* organizational chart, listing Pulscher as "Commander" of the Birmingham office. Pulscher met with Bishop in December 1994 regarding her request for a transfer to Gadsden because the plaintiff had complained to Pulscher that Bishop was working out of the Gadsden office. Therefore, the AJ's determination that Pulscher was unaware of the plaintiff's whistle blowing activities defies reason. *See* Initial Decision at 56.

### B. Retaliation for Filing EEO Complaints

The plaintiff argues that the agency was required to establish by clear and convincing evidence that the same investigation of plaintiff would have occurred even if he had not engaged in protected activity. Plaintiff's brief in opposition at 2.

Plaintiff's counsel raised allegations that Pacheco had an incentive to retaliate against the plaintiff.[7] The plaintiff had filed an Office of Special Counsel complaint on January 6, 1996 based on his non-selection for a GS-13 position which was available in Arkansas. According to Jerry Tucker, management had changed its reasons for not interviewing the plaintiff for this position three times.[8] H.R. 242, 276. The first reason given was that the

---

[7]Robert Pacheco was the chief of contract operations north in Birmingham during the relevant time period. H.R. 364-365.

[8]Jerry Tucker is another contract administrator in the Birmingham office. He is also chief stewart for the labor union in Birmingham.

plaintiff could not skip from a GS-11 to a GS-13 position. H.R. 276. After Tucker established that the plaintiff could, the next reason given was that the plaintiff did not check the box on the form that he would accept a temporary appointment. H.R. 281. Tucker testified he knew that on some panels the selecting officials requested the panels to change their rating system so a different person could be selected for a position. H.R. 272. The selecting official on the incident in question was Pacheco. H.R. 273. Tucker did not specify a third reason for defendant changing its position with regard to the plaintiff not being considered eligible for this appointment.[9]

As evidence that the same action, termination, would have been taken against the plaintiff even if he had not engaged in protected activity, the defendant alleges that the plaintiff failed to follow orders. Pulscher stated that the plaintiff was instructed to stay away from Zealy and have no interaction with her, and that the plaintiff failed to comply with this order. H.R. 650. The court finds this allegation ludicrous.[10] From the time the plaintiff and Zealy were mutually instructed to avoid each other, except professionally (according to Zealy's testimony), to the time of the elevator incident in June, no evidence the plaintiff had

---

[9]Tucker testified that he was told personally in 1989 by management officials in Birmingham not to apply for a position because it would cause problems for Pacheco to have the person he wanted to fill the position. H.R. 273. Tucker was told if he continued to apply, he would be fired. H.R. 273.

[10]Equally ludicrous is Pulscher's further support for his statement the plaintiff failed to follow orders by: "Zealy complained about him being in the area where she was working, for example, at the Xerox machine, making copies, or using other equipment, that he would be following or in the general area –". H.R. 685. This court can find nothing insidious about the plaintiff making copies.

14

any interaction with Zealy exists. The evidence in this case is that the plaintiff was on an elevator, Zealy entered the elevator, the plaintiff asked Zealy if she was sure she wanted to get on the same elevator, Zealy backed away and freaked out. This court finds Zealy's attempt to ride an elevator with plaintiff to be wholly outside of plaintiff's control.[11]

The plaintiff had been counseled twice previously, with respect to Zealy and Bishop.[12] H.R. 651. On the basis of these two counselings, Pulscher concluded the plaintiff would continue the same behavior towards these two women. Further, Pulscher stated the plaintiff's prior work record was unacceptable. H.R. 652. He did not review the plaintiff's performance appraisals.[13] H.R. 678. He testified he was convinced the plaintiff would not change his behavior and people in his work force felt threatened. H.R. 660. He also stated

---

[11]According to Pulscher, the proper course of action would have been for the plaintiff, who was already on the elevator, to exit it. When the plaintiff's counsel questioned Pulscher on the fact the plaintiff was already on the elevator, the AJ did not let him respond to the question. H.R. 681-682.

[12]Neither of these were formal disciplinary actions. H.R. 682.

[13]The plaintiff's performance appraisals demonstrate that the plaintiff was rated "fully successful" in all five job elements from April 1, 1993 through March 31, 1994 by his supervisor Kathy Bolton; "highly successful" in each of the five job elements for April 1, 1994 to March 31, 1995 by Major August R. Manusco; "highly successful" or "exceptional" for the March 31, 1995 through October 1995 by Irvin Jackson; and "highly successful for April 1, 1995 through March 31, 1996, again by Irvin Jackson. For the category "interpersonal relationships" the plaintiff received a 4 (highly successful) for the 1993-1994 rating period; a 4 for the 1994-1995 rating period; a 5 (exceptional) for the Mar.-Oct. 1995 rating period; and a 3 (fully successful) for the 1995-1996 rating period. Defendant's Exhibit F.

15

the investigation revealed harassment of Kathy Bolton and Janet Odom as well.[14] H.R. 686.
The court notes Bolton was replaced as plaintiff's supervisor by Manusco in 1994.

Pulscher testified he was unaware of the plaintiff's four EEO complaints. H.R. 660.
He then testified he became aware of the complaints when he met with the plaintiff, an EEO
coordinator, another supervisor and the union representative. H.R. 660-661. Pulscher
testified he did not see a formal EEO complaint, but he did see a draft. H.R. 662. He then
testified he was aware the plaintiff had gone to John Hauschild, the EEO coordinator, in
March 1996, and was told at that time the plaintiff was going to file a formal complaint.
H.R. 663. By letter from Hauschild, Pulscher was actually informed on February 20, 1996,
the plaintiff had pursued the informal process for his claim of gender discrimination. H.R.
664; Pulscher Exhibit 18 (also labeled appellant's Exh. O). In fact, Pulscher had requested
Shratter to review plaintiff's claim that Bishop filed a false travel voucher pursuant to a letter
plaintiff sent dated February 14, 1996.[15] H.R. 671-674. Hence, this court finds substantial
evidence Pulscher had knowledge of the plaintiff's protected activity at the time the decision
to terminate the plaintiff was made.[16]

---

[14]Janet Odom was a co-employee of plaintiff's who was part of the intern program.

[15]Eric Shratter was the chief of the operations support area in the Birmingham office
beginning in November 1994. The upshot of Shratter's investigation was that the plaintiff had
violated the Privacy Act to obtain information, although Pulscher's testimony at the hearing
supports a finding that plaintiff's information was obtainable from documents to which all
employees had equal access. H.R. 670-674.

[16]In fact, the court finds curious that Pulscher, allegedly aware of Bishop's complaints
against the plaintiff in December, 1994, decided after this gender discrimination claim was made

### 1. The Specifications Relating to Bishop[17]

**Specification 1 (b)**: Telling Mr. Fagan that Ms. Bolton liked Ms. Bishop better and that is why she got a higher rating, which put her higher on the retention register than himself. H.R. 152.

**Specification 1(c)** : Telling Mr. Fagan that he was tracking Ms. Bishop's time on a daily or weekly basis so that he could "get her in trouble," keeping a file and tracking her workload. H.R. 166-167.

**Specification 1(e)**: Complaining to Fagan about Ms. Bishop on a daily basis for approximately two years. H.R. 158-159.

Kathy Bolton testified that she hired Barry Fagan, the plaintiff and Bishop (from the scholar internship program) at approximately the same time.[18] H.R. 109. Fagan and plaintiff started the same day, May 12, 1992. H.R. 150, 811. They were friendly. H.R. 150-151. In September, 1994, a retention register was published in which the plaintiff was listed below Ms. Bishop and voiced his opinion that the system was unfair. H.R. 438-440. He similarly told Farris that he was concerned about being the low person on the retention register.[19] H.R. 93, 879. He also stated he thought the ranking was unfair because he had more experience than Bishop and was doing more work than she was. H.R. 880. Farris stated that plaintiff

_____

the plaintiff was a danger to his workers. Even more interesting is that Hauschild found the plaintiff's claims to be well-founded, and communicated the same to Pulscher. H.R. 665.

[17]As neither party has raised the propriety of the specifications the AJ found unsubstantiated, the court does not address these.

[18]Before the plaintiff was hired for this job, he served as a contract specialist in the United States military. H.R. 811.

[19]Nancy Farris was Management Assistant to Eric Shratter in the Birmingham office. Organizational Chart contained in Exhibit H.

had more seniority that Bishop. H.R. 95. Bolton testified that plaintiff discussed with her the retention register and the fact he was listed lower than Bishop. H.R. 115. Fagan stated the plaintiff told him Bishop was rated higher because of favoritism by Bolton. H.R. 152, 155. Fagan stated the plaintiff seemed obsessed by this. H.R. 158.

Fagan stated that the plaintiff told him that he was tracking Bishop because he felt she was not coming to work on time. H.R. 156. The plaintiff stated he had reported this to Bolton and Major Manusco, and Fagan also heard that the plaintiff had told the colonel about it. H.R. 169. Further, the plaintiff said he looked at Bishop's time card while it was on Farris' desk because he believed she was not working the time she was putting on her card. H.R. 166-167. The plaintiff showed Fagan he was keeping track of Bishop's time on a desk calendar. H.R. 167. This was in the 1993-1994 time frame. H.R. 167. The plaintiff denies discussing this with Fagan. H.R. 830. According to Fagan, nothing was done about Bishop's time keeping.[20] H.R. 170.

This testimony supports the AJ's finding of a preponderance of the evidence to support the factual allegations of the above specifications. However, this court finds that the factual allegations at issue are wholly unrelated to the sex of Bishop and in no way imply sex-based harassment on the part of the plaintiff. The AJ's finding that she believed the

---

[20]In Bishop's list of events, on September 13, 1995, she was told that the plaintiff had recruited a spy, being Donna Storey. Apparently, Bishop heard that Fagan told this to Nancy Farris. In support of this allegation, Bishop goes on to state "I did notice on one occasion that Donna cut her eyes to the side when I entered the workplace and pulled a yellow legal pad from her drawer as I passed to my office." *See* defendant's Exhibit E.

plaintiff would not have made similar comments about male co-workers is arbitrary, speculative and wholly inappropriate.

> **Specification 2**: Asking Ms. Bishop personal questions about the length of her marriage, number of children, her husband's job, her prior job and whether she colored her hair.

The plaintiff at some point in time asked Ms. Bishop the date of her marriage and when her first child was born. She did not answer, to which she alleged the plaintiff responded that "I knew you had to get married, you Baptists are all alike." H.R. 435. This was apparently sometime in 1994. H.R. 509. The plaintiff alleges this conversation, which did not include a comment about Baptists, probably took place in 1992. H.R. 852.

Although not mentioned by Bishop, Nancy Farris, the secretary whose cubicle adjoined Bishop's, testified she heard plaintiff ask Bishop if she colored her hair.[21] H.R. 87. She also heard plaintiff ask Bishop when she got married, how old her child was and what her husband did for a living. H.R. 89. Farris testified that the plaintiff asked other employees similar questions as well. H.R. 96. Bolton heard plaintiff ask Bishop if she dyed her hair. H.R. 118. She told him he needed more work to do, and never heard him ask such questions again. H.R. 135, 142. She stated she never heard plaintiff make personal comments to Bishop or any other woman about her. H.R. 119. Bolton testified that the

---

[21]The plaintiff explained Bishop came to work one day and her hair was a different color, prompting the question. H.R. 855.

19

plaintiff asked personal questions about her family, which did not make her uncomfortable. H.R. 134.

Bishop also talked with Tucker in December, 1994, who suggested she file a formal complaint against plaintiff, which she did not do until March, 1996. H.R. 215, 218, 444. She related to Tucker that the plaintiff had made uncalled for remarks, going through her work, and watching her. She also alleged the plaintiff had asked her when she got married and when her child's birth date was. H.R. 216. Tucker states he talked to their supervisor, Major Manusco, about Bishop's complaints. H.R. 217. Tucker admits however, that part of this conversation involved Bishop complaining that she could no longer report to the Gadsden office because of the plaintiff's reporting her. H.R. 224. He further admits that Manusco told him the plaintiff was not doing anything wrong. H.R. 235.

The AJ found that these comments were made in 1994. Initial Decision at 12. The AJ's finding that the plaintiff's testimony on these issues were not credible is immaterial to this court as these comments were innocuous. Bolton testified that she gave the plaintiff more work to do and never heard him asking these type of questions again. As such, and when Tucker's testimony is considered as well, this court can assign no weight to the specification as it adds no support to the agency's discharging the plaintiff and finds the AJ's finding that the specification supports the charge of unbecoming and rude behavior to be against the substantial weight of the evidence.

20

**Specification 3**: The plaintiff told Ms. Bishop in the Spring of 1994 that (1) he did not stand a chance of being promoted as long as she was there; (2) that she would be promoted before him, especially because she is a woman; (3) the Chief of Financial Services, GS-13 position is occupied by a woman (which proves what he means); and (4) "you women have it made"; as well as bringing her job announcements for positions elsewhere.

The AJ found that the "statements in this specification typify the attitude toward women that the appellant demonstrated on various occasions." Initial Decision at 14.

Bishop had a conversation with the plaintiff in early 1994 in which she alleged the plaintiff stated the government favored women and that it "showed to me maybe a resentment of competing with women." H.R. 426-427. She alleged she would find job announcements lying on her desk and "it was my understanding Morris had laid them there." H.R. 427. She later testified that the plaintiff told her he had left them there and that after her three year internship program was over, she would have looked into a job in the Gadsden area. H.R. 525. The plaintiff testified that he left the job announcements for her because she was trying to get a job in the Gadsden area. H.R. 850.

Bishop told Bolton that plaintiff told Bishop the only reason Bolton was a GS-13 was because she was female.[22] H.R. 145. The plaintiff also testified he did say that Bishop

---

[22]The plaintiff denies ever making this statement. He testified what he actually said was "the GS-1102 series is a – is a dominant female position series number –" meaning that mostly women held these positions. The plaintiff explained that all of the supervisory positions in his office were filled by women. H.R. 820-821. The plaintiff stated that he complained to Manusco about this. H.R. 822.

would be promoted before him because she was female because all the other supervisors at the time were female. H.R. 843.

Bishop further alleges that the plaintiff made her job so intolerable that in 1994, she asked what training costs she would have to repay if she quit the internship program. H.R. 469-470.

In August, 1994, the plaintiff told Ms. Bishop "something to the effect of I'm not going to hold the door open for you, you women – you can open your own door. You women want it all, jobs and all." H.R. 437. The plaintiff testified that this comment was in response to Bishop's question as to whether he was going to hold the door open for her. H.R. 844-845. The plaintiff stated this was a friendly conversation held in a joking manner. H.R. 845.

While this court agrees with the AJ's finding that the underlying factual allegations of the specification were proved by a preponderance of the evidence, this court finds that the statements are only insidious when taken out of the context in which they were stated. Furthermore, regardless of whether Bishop requested the plaintiff to keep her informed of job announcements, this court finds nothing sinister in the plaintiff's providing them.

> **Specification 4**: The appellant is charged with constantly questioning Ms. Bishop about what she was working on, how long it took her, and with going through one of Ms. Bishop's completed pricing cases which she had turned in to Ms. Bolton.

Bolton stated she would see the plaintiff at Bishop's desk more often than necessary. H.R. 117. Ms. Bishop's testimony reveals that she had left a file for her supervisor, Ms. Bolton to review in May 1994. H.R. at 429. Ms. Bishop alleges that she then saw plaintiff going through the report and when she asked him about it, he asked her how she printed her worksheet sideways. H.R. 430; 502. This court can find nothing sinister in such a question.

Bolton testified that she twice had people tell her plaintiff was seen going through papers on her desk. H.R. 120. She does not know when this was, nor who these two people were. H.R. 120, 140. She never asked him what he was looking for on her desk. H.R. 139. She did not warn him or reprimand him. H.R. 139. In November, 1994, Bolton became the area chief for Huntsville Area Two. H.R. 121.

Ms. Bishop further testified that she "noticed him frequently going through the log and pricing register. I also heard comments to the effect that it was like he was comparing our workload..." H.R. 431. Further the plaintiff asked her how long it took her to do something and what she was working on. H.R. 432.

The plaintiff did not deny looking at one of Bishop's completed cases or asking her how long a case took her. Regardless of the AJ's statement that "I find it hard to believe that the appellant was reviewing Ms. Bishop's pricing report and questioning her about her work because he thought he could learn something from her" this court finds that the agency failed to prove by a preponderance of the evidence that this was done "for the purpose of finding fault with her work or otherwise get her in trouble." Initial Decision at 17. The AJ

23

reemphasized Fagan's testimony that plaintiff told him he was tracking Ms. Bishop's time on a daily or weekly basis so that he could "get her in trouble" but nothing remotely supports the AJ's finding that the plaintiff looked at Bishop's pricing report so that he could get her in trouble. The AJ pulled this testimony wholly out of the context in which it was stated. The lack of evidence in contradiction of plaintiff's testimony as to why he looked at Bishop's pricing report along with Bolton's testimony that she never inquired of the plaintiff what he was doing looking through a pricing report on her desk create substantial evidence that this review of Bishop's work by plaintiff was not done to "get her in trouble." Thus, while the factual allegations of this specification are supportable, the conclusion the AJ reaches, that the plaintiff engaged in this behavior for the purpose of getting a co-employee in trouble, is arbitrary and capricious.

> **Specification 5**: The appellant is charged with telling Ms. Bishop and Ms. Farris, at the Adams Care Eye examination on or about August 11, 1994, that they can open their own doors, that he won't hold the door open for them, that "you women want it all... jobs and all."

As this court finds that this is identical and part of the complaint stated in Specification 3, this court finds it should not have formed a separate allegation and thus, the AJ's conclusion that this specification should be sustained was in error.

> **Specification 6:** The appellant is charged with, on or about September 8, 1994, and during the latter part of September 1995, peering into Ms. Bishop's cubicle to see what she was doing. The agency charged that appellant's constant staring and watching Ms. Bishop continued into October and November 1995.

24

Ms. Bishop testified that after the retention register was published, the plaintiff would watch her. She felt so threatened she confided in her husband. H.R. 440. Bishop allegedly told Ms. Bolten, the union representative Jerry Tucker and Major Manusco in December 1994 that the plaintiff was watching her.[23] H.R. 441. She further stated that in April, 1995 the plaintiff "rotated to contracts" and "the tensions began to ease." However, Bishop alleged the watching then worsened around September, 1995. H.R. 445. Further, Ms. Bolton, the supervisor, saw the plaintiff peering into Bishop's cubicle, according to Ms. Bishop. H.R. 459.

Bishop states the plaintiff began watching her more heavily in September, October and November, 1995, which made her feel very threatened. H.R. 446, 526-530. The plaintiff denies ever threatening any employee physically or verbally. H.R. 840. Farris states she saw plaintiff peeking into Bishop's cubicle.[24] H.R. 92. Farris told Bolton that the plaintiff "was getting on her nerves." H.R. 123.

Ms. Bishop, while supervised by Bolton, worked out of the Gadsden office. H.R. 134. Bishop admitted the plaintiff complained to Major Manusco that she was allowed to do this, and Manusco told her she could not work out of that office any more. H.R. 475. See also

---

[23]Of course, Bolton was at this point the Hunstville Area Two supervisor. The testimony is unclear as to whether Bolton continued to supervise Bishop, but not plaintiff.

[24]The plaintiff explained that he did look into her cubicle to see if she was there if he needed to leave her a message or if her phone was ringing. H.R. 836. However, he denied ever leering at her or any other female employee. H.R. 839. Further, the plaintiff stated he had to walk by her cubicle to get to his office or to go on break. H.R. 839-840.

plaintiff's testimony at H.R. 823-824 (Manusco told him Bishop had no business going to Gadsden). Bolton testified that no one else was allowed to work out of the office closest to their home because of a personal appointment in the area. H.R. 135. On cross-examination, Ms. Bishop admits that this is why she confronted the plaintiff on this occasion. H.R. 476, 479. The plaintiff testified that when he reported Bishop's failure to work out of the Birmingham office, Manusco did not make any comment about plaintiff observing Bishop's comings and goings. H.R. 825.

The plaintiff filed an EEO complaint about this perceived unequal treatment. The EEO counselor he spoke with was John Hauschild, who told him he needed times, dates and places to support the allegations. H.R. 825-826. The plaintiff alleges that Hauschild never told him to not track Bishop's attendance, but rather told him he had to do so. H.R. 826. The plaintiff further testified he consulted only publicly accessible records to track Bishop's timekeeping and vehicle usage. H.R. 827-828. Furthermore, the plaintiff testified that everybody knew that Bishop was not coming to work and was showing up late. H.R. 828.

The AJ concluded that "Given the appellant's demonstrated preoccupation with Ms. Bishop, her work and her whereabouts, I find that he did go out of his way to stare at her in her cubicle, at lunch, and in the hallway. There is certainly no evidence that he was stalking her, but clearly he was trying to gather information as to her whereabouts and/or to make her feel uncomfortable by letting her know that he was watching her." Initial Decision at 20. This court finds sufficient evidence to support the AJ's finding that the underlying factual

allegations of this specification, that the plaintiff peered into Bishop's cubicle in September,

1994 and September, 1995, are supported by a preponderance of the evidence.   However,

this court finds no evidence to sustain a conclusion that such peering was motivated by sex-

based discrimination or a dislike of competing with women.[25]

> **Specification 7**: The appellant is charged with turning red and raising his arm
> when Ms. Bishop asked him if he had a problem with her on or about
> November 1, 1994.

Bishop alleges that she tried to talk to the plaintiff about the "watching" but "his face

turned red and he raised his arm. I was afraid he was going to hit me, so I stepped back, and

he said something to the effect, oh you, you just get out of here, and kind of ordered me out

of his office, and I did."[26]   H.R. 442.   She alleged she realized "maybe he could be violent

and I didn't want any more contact with him."   H.R. 442-443.   The plaintiff states that on this

occasion, he had just spoken with Manusco regarding Bishop's failure to work at the

Birmingham office, and Manusco had told him he would stop Bishop going to Gadsden.

H.R. 841.   He states Bishop came into his office and said he did a "very un-Christian thing"

and that "your mother did not raise you correctly."   H.R. 841.   The plaintiff explained that,

at the time, his mother had a tumor and had been given six months to live. H.R. 841.   The

plaintiff complained to both Jim Brown and Manusco about these comments.   H.R. 842.

---

[25]See discussion "Whether the plaintiff engaged in comments or actions of a sexual nature," *infra*.

[26]The specifications list this incident occurring on or about November 1, 1994.

Bishop states that she was afraid of the plaintiff, that this incident happened in 1995 and that she told Major Manusco about the plaintiff's comments in December of 1994. H.R. 443. She then talked to Colonel Pulscher, also in December, 1994. H.R. 443-444. In that conversation she did not raise complaints about the plaintiff, in fact she testified that the conversation was geared toward complaints the plaintiff had made about her. Colonel Pulscher testified that in the December, 1994 meeting, Bishop asked to be reassigned to the Gadsden office, because of the distance she was having to commute to Birmingham. H.R. 631-633. His supervisor recommended that he disapprove this request, which he did. Pulscher told Bishop it could be reconsidered in six months. H.R. 632-633.

This court disagrees with the AJ's finding that Bishop's testimony was more credible than plaintiff's. Initial Decision at 21. This court finds that Pulscher's testimony supports the plaintiff's claim that he had spoken to Pulscher about a different set of rules applying to Bishop so that she could work out of the Gadsden office. Furthermore, from her testimony, it is evident that Ms. Bishop was quite angry at being told that since her job was in Birmingham, she was expected to show up at the Birmingham office, not the Gadsden office, for work.[27] H.R. 483, 491, 495. As such, this court finds Bishop's testimony questionable,

---

[27]Ms. Bishop apparently chose to live nearer the Gadsden office rather the one in Birmingham and further chose not to move to Birmingham. *See also* letter from Bishop to Jerry Tucker, dated March15, 1996, stating working in the Birmingham office has become very burdensome on herself and her family. She states "Should the issue here be where my duty station is, or COMMON SENSE? .... Using Morris' 'reasoning' I would spend more time on the highway than performing my duties." The remainder of this letter goes on to state that she "can only speculate that some complaint is looming over my head." The gist of the remainder of the letter is that plaintiff is to blame for her no longer being able to work out of the Gadsden office

28

as she had much to gain from creating allegations against the plaintiff. This court finds the

evidence supports a finding that Bishop provoked plaintiff at the time in question. While the

court agrees that nothing in this specification supports a finding that the plaintiff took such

action because of Bishop's sex, this court disagrees that such behavior on the part of the

plaintiff constitutes conduct unbecoming a federal employee and rude behavior. As such,

this finding of the AJ is in error. *See* Initial Decision at 22.

> **Specification 8:** The appellant is charged with obtaining Ms. Bishop's time
> sheets in March 1996 without permission or authority.

Tucker testified the plaintiff had come to him in 1995 about a separate matter and the

question of Bishop's time keeping arose. Tucker states the plaintiff had one of Bishop's time

and attendance sheet in his possession, to which Tucker told the plaintiff he should not have

that because "it was a privacy act thing." H.R. 218-219. Tucker also spoke with Pulscher,

who stated Bishop was under investigation for falsification of a travel voucher or time sheets

and the plaintiff "seemed to have some kind of fixation on Ms. Bishop." H.R. 220. Tucker

states this could have been in December 1995 or January, 1996. H.R. 235. Pulscher testified

Jerry Tucker told him he had seen the plaintiff with Privacy Act information, although the

plaintiff denied having any such material to Pulscher in March, 1996. H.R. 645. However,

---

and have a government vehicle at her home. This court notes that while Bishop stated in her list
of problems with plaintiff she kept for over two years, "March 14, 1996 – I learned that I was
being investigated for time and travel fraud ..." in her letter of March 15, 1996 she states that she
can only speculate about some complaint.

Pulscher later testified he could not say he actually asked the plaintiff if he had such information in his possession. H.R. 689.

The plaintiff denies ever attempting to obtain Bishop's time sheets. H.R. 828. Plaintiff does admit that a copy of Bishop's time record was found on his desk, but he does not know how it got there. H.R. 832-833. The plaintiff believes Pulscher was behind this incident because at the March 13, 1996 meeting to discuss the plaintiff's EEO complaints of sex discrimination and retaliation, Pulscher accused the plaintiff of stealing Bishop's time records. H.R. 834, 884. At the same time, Pulscher accused the plaintiff of harassing women in the office. H.R. 834. He stated the offenses of sexual harassment, safety in the workplace, and the other allegations were extremely serious. H.R. 648-649. Interestingly, the typewriter wrist grabbing incident with Zealy occurred six days later. H.R. 885. Pulscher concluded the plaintiff had committed each of the allegations and that the appropriate remedy was termination.

This court agrees with the AJ that Tucker's testimony was credible. Therefore, this court upholds the AJ's finding that the agency proved by a preponderance of the evidence that the plaintiff had a copy of Bishop's time sheet without permission or authority. This court is unable to find any evidence in support of any conclusion as to the manner in which the plaintiff obtained the same.

> **Specification 9:** The appellant is charged with staring at Ms. Bishop in an elevator in the Birmingham office in an intimidating manner.

30

On May 2, 1996, Bishop was showing Tyrone Dozier around the building, went to the back elevators, the doors opened and the plaintiff jumped on the elevator at the last minute. H.R. 319-320, 448-449. The plaintiff "stared at [her] in an intimidating manner." H.R. 450. The plaintiff states this incident never occurred. H.R. 855-856.

Dozier's testimony was that the plaintiff got on the elevator with them and stared at Bishop. Dozier questioned why the plaintiff was staring at her and Bishop replied she did not know. H.R. 320. As this incident was well after Bishop made allegations of sexual harassment against the plaintiff, his staring at her is not what this court would consider to be outrageous behavior.

However, this court finds that a preponderance of the evidence supports the factual allegations of the specification. This court does not find that such behavior lends support to sexual or sex-based harassment charges. As stated previously, this court can find no evidence that the plaintiff's behavior toward Bishop was motivated by the fact that she was a woman, and not the fact that special privileges apparently applied to her and no one else.

## 2. The Specifications Relating to Zealy

**Specification 1** The appellant is charged with grabbing Ms. Zealy on her arm on March 19, 1996.

This court finds Nancy Zealy's testimony to be unbelievable. Ms. Zealy was a secretary with defendant, supervised by Bob Pacheco. H.R. 366, 557. When she began in October, 1994, she found the plaintiff to be friendly, although he asked personal questions.

31

H.R. 559. *See also* plaintiff's testimony at H.R. 857. He did comment to her that Bishop was higher than he was on the retention register. H.R. 560. He also asked her whether he was certified to compete for an Arkansas position. H.R. 561. After the selection for that position was made in December, 1995, the plaintiff filed a grievance regarding his name not being included on the certificate of eligibles.[28] H.R. 369-370. The plaintiff told Zealy she should tell the truth if asked, sometime between November 1995 and March 1996. H.R. 562. She did not know what he was talking about. H.R. 563.

Because of this move, Zealy testified she went to ask the plaintiff about parking applications and found him in the hallway at the typewriter. H.R. 564. The plaintiff tried to cover up what he was working on, she asked about parking applications, and he responded not to look over his shoulder at what he was doing. H.R. 565. Zealy reported to Jackson that the plaintiff told her he was not in charge of them, but Zealy did not leave at that point. H.R. 352. He said something "about having to tell the truth, when asked, and about having an investigator or his attorney, somebody looking into it. And he didn't know who his friends were, and he turned around in his chair, and grabbed my right wrist with his left hand, and came over to me, and stood above me, and he was just kind of looking over the cubicle

---

[28]The union representative, Tucker, told Pacheco that after plaintiff filed this grievance and Tucker looked at the veteran's act under which the plaintiff claimed his name should have been included, Tucker agreed with the plaintiff. H.R. 371. Pacheco therefore told the plaintiff that if he was left off a list in the future, he should report the same to Pacheco. *Id.*

areas." H.R. 566. The plaintiff let go of her wrist and she left.[29] H.R. 566. Tucker testified

the plaintiff told him that Zealy insisted on reading the document he was typing over his

shoulder, the plaintiff covered the document with his hands, and Zealy tried to physically

remove his hands. H.R. 269. Ms. Zealy states this incident, which occurred around two

o'clock, scared her and made her cry. She went to find a supervisor, but could not, so she

went to her desk until three o'clock and then went home. H.R. 567; 585. She did not go to

the security guard. H.R. 599. During this incident, a secretary rolled her chair back out of

her cubicle to tell the plaintiff he had a phone call. H.R. 593.

The next day she came in early and e-mailed her supervisor. H.R. 374, 569. Pacheco

testified this following day, Zealy was emotional, trembling, teary-eyed, and visibly upset.[30]

H.R. 374. A Mr. Jackson came from Huntsville on March 21, 1996 to investigate this

incident.[31] H.R. 569. Ms. Zealy volunteered that she was sure the plaintiff said that she

touched him first, but she did not. H.R. 569. The plaintiff told Jackson that he was working

on an EEO complaint, that Zealy tried to look at it, he moved her out of the way and felt that

---

[29]Zealy reported to Jackson that he took her arms and moved her while seated in his chair. H.R. 351. The court finds Zealy's statement that he "stood above her" while he was seated in a chair, as reported to Jackson, to be physically impossible.

[30]The court cannot help but note this reaction, the day after the alleged wrist-grabbing, which left Zealy uninjured, unbruised and in no need of medical attention, might have been slightly exaggerated.

[31]Irvin Jackson is an area chief in Huntsville, Alabama. He was also the plaintiff's supervisor during 1995 and part of 1996. H.R. 336.

she was the aggressor.[32]   H.R. 339.   The plaintiff stated he did not initiate the physical

contact in question. H.R. 857, 858. He further testified that after he removed her hands from

his, their conversation continued in a friendly manner. H.R. 859, 862. Mr. Jackson testified

that he spoke with the two employees whose cubicles were very close to the typewriter. H.R.

338. Lucille Curry and Evelyn Anderson did not see any altercation or hear anything occur.[33]

H.R. 252, 254, 338; 346-347. Curry and Anderson were approximately four or five feet

away. H.R. 349, 736. Curry stated if there had been any kind of argument or pushing or

shoving, she would have heard it. H.R. 717. According to Curry, the plaintiff and Zealy

were both smiling and talking when she saw them. H.R. 727. Anderson stated she did not

hear their conversation, but if it had been loud, she would have heard it. H.R. 732. She saw

them talking and they appeared to be in everyday office communication. H.R. 733.

Mr. Jackson told Zealy and the plaintiff to stay away from each other, other than for

professional requirements. H.R. 340, 569, 611. However, Jackson referred the plaintiff to

the EAP because the plaintiff seemed nervous and excited. H.R. 341. Zealy did not go to

a doctor or have any problem with her wrist. H.R. 621. Jackson saw no bruising on her wrist

and agreed that Zealy was using her wrist. H.R. 350. The documents generated from Zealy's

---

[32]The plaintiff's version of events is actually supported by Pacheco's testimony that, at
another point, he knew the plaintiff was working on an EEO complaint on government time
because "I caught a snippet of what he was writing, and when he saw me, he snatched it away to
hide it." H.R. 403. This is exactly what plaintiff claims happened when Zealy tried to see what
he was typing.

[33]Lucille Curry has been a contracts management assistant with the defendant since
November, 1995. H.R. 715. Evelyn Anderson is a secretary with the defendant. H.R. 730.

complaint do not support an instruction that the plaintiff was told to stay away from Zealy until March 25, 1996.[34]  H.R. 683.  The plaintiff stated he was not told to stay away from Zealy at the March 21, 1996 meeting.  H.R. 926.  However, the plaintiff later agreed he was told to stay away from Zealy.  H.R. 928, 936.  The plaintiff stated that after this incident, he tried to stay away from Zealy.  H.R. 867.  The plaintiff testified avoiding her altogether was difficult because they shared some office equipment.  H.R. 936.  The plaintiff told Pacheco that his avoiding Zealy was not possible as she was Pacheco's secretary and the plaintiff had to go through Zealy to speak with Pacheco.  H.R.937-938.

The AJ found "[b]ased on Ms. Zealy's behavior at the hearing, I found her testimony as to how upset she was by this encounter to be not credible.  The degree to which she expressed emotional upset at the hearing, crying over this encounter, was, in my view, too overplayed and overdramatized to be sincere.  And, her subsequent over-reaction to minor comments made by the appellant, as discussed below ... revealed a tendency to milk the situation for all the attention she could get."  Initial Decision at 29.  This court agrees fully.  However, this court cannot reconcile this finding with the finding that the appellant grabbed Zealy's wrists because she was trying to read what he was writing.  *Id.*  The AJ found that

---

[34]In addition to the documents not supporting an instruction for them to avoid contact with each other on that date, the best Pulscher could state was "I would hope it was discussed.  It would be impossible to write everything you might want to state in a record, and I don't know exactly what was communicated verbally to Mr. Plaisance."  H.R. 684.  This court finds that for the plaintiff to be terminated for not complying with instructions, the defendant should, at a minimum, be able to show that the plaintiff was at least given that instruction before the date the plaintiff was alleged to have failed to follow it.  The defendant here has failed to do this.

this specification did not support a finding of sexual harassment, but did sustain the specification as to conduct unbecoming and rude behavior. Initial Decision at 30. While the AJ found that the plaintiff should not have touched Zealy at all, regardless of what she was doing, the AJ failed to consider the evidence that Zealy initiated the physical contact with plaintiff by trying to remove his hands from what he was trying to cover up that he was typing. This court finds no evidence to support a conclusion that the plaintiff grabbed Zealy in a rude and unbecoming manner. As such, this court finds the AJ's decision sustaining this specification to be in error.

> **Specifications 3:** The appellant is charged with interacting with Ms. Zealy on March 25, 1996 after he had been told on March 21 and 25, 1996, not to approach, speak, nor in any way interact with her.

As a result of the March 21, 1996 counseling session, the plaintiff was told "it is unacceptable to grab another associate for any reason, or in any other way harass another associate." H.R. 245. Tucker testified the plaintiff did not grab any one else and, aside from the elevator incident, did not harass any one else. H.R. 245.

Zealy stated that two days later, the plaintiff said "howdy, howdy" to her and then apologized "sarcastically" for grabbing her wrist. H.R. 402, 570. She stated this incident, when he apologized to her, scared her. H.R. 571. She therefore e-mailed Pacheco again and told him the plaintiff spoke to her.[35] H.R. 571. Thus, on March 25, 1996, a memo to the

---

[35]Jackson's testimony was that Zealy contacted him and he contacted Pacheco. H.R. 341. Jackson states he told the plaintiff after this incident to not even say hello to Zealy. H.R. 342.

36

record reflects the plaintiff's instruction not to talk to Zealy. H.R. 360. This same date, Pacheco met with the plaintiff, Tucker and Hauschild. H.R. 246, 376. Pacheco instructed the plaintiff to see the EAP counselor, not to prepare EEO complaints or grievances on government time and not to investigate his associates.[36] H.R. 379-380. Pacheco admitted the plaintiff had a right to prepare EEO complaints on the government's time with his supervisor's permission, which could not be withheld unless the same interfered with the workload. H.R. 386.

The plaintiff reported to the EAP counselor, who reported the plaintiff had no problems and was not a threat. H.R. 278, 285, 402-403.

In other specifications, the AJ found that the plaintiff's comment to Zealy of "howdy, howdy" was not "actionable misconduct as either sexual harassment, conduct unbecoming, rude behavior or failure to follow instructions." Initial Decision at 31. However, the AJ then finds the plaintiff's inquiry as to Zealy's arm to be a violation of his instructions to stay away from Zealy. Initial Decision at 32. The court finds these separate findings of the AJ to be irreconcilable. This court finds the plaintiff's inquiry as to Zealy's wrist to be basic communication, like saying "howdy, howdy." Further, the plaintiff testified he tried to avoid Zealy whenever possible. This court finds this testimony to be credible. As such, this court

---

[36]Pacheco testified he sent the plaintiff to the Employee Assistance Program Counselor (EAP) in part due to conversations he had with other employees. He claimed Bolton told him in the summer of 1995 that plaintiff had been bothering Bishop for a while. Pacheco then admitted Bolton had seen the plaintiff looking at Bishop one time. H.R. 383, 385-386.

37

finds no evidence to sustain this specification as to any of the charges. The AJ's finding

otherwise is in error.

### 3. Specifications Relating to Kathy Bolton

**Specification 1:** The plaintiff is charged with making a statement to Ms. Bishop sometime between the Spring of 1994 and Spring of 1995, that Ms. Bolton was in her position as a GS-13 based solely on the fact that she is female, or words to that effect.

Bishop told Bolton that plaintiff told Bishop the only reason Bolton was a GS-13 was

because she was female.[37] H.R. 145. Bolton stated she never disciplined plaintiff and gave

him a "four" as a rating for interpersonal relations as a performance rating.[38] H.R. 126-127.

The plaintiff received a four prior to initiating the EEO process. In October, 1995, he

received a five in this area. H.R. 822, 835. From this testimony, this court draws the logical

conclusion that Bolton had few problems with plaintiff, regardless of what Bishop said the

plaintiff said about Bolton. The court finds that the factual allegations underlying the

specification were not proved by a preponderance of the evidence. In other words, while the

court has no doubt that Bishop alleges plaintiff stated this, the court can find no evidence in

support of Bishop's allegation. Furthermore, this court finds no support for the allegation

---

[37]The plaintiff denies ever making this statement. He testified what he actually said was "the GS-1102 series is a – is a dominant female position series number –" meaning that mostly women held these positions. The plaintiff explained that all of the supervisory positions in his office were filled by women. H.R. 820-821. The plaintiff stated that he complained to Manusco about this. H.R. 822.

[38]Bolton stated a "four" meant the plaintiff established and maintained constructive working and interpersonal relationships with all members of the organization. H.R. 127.

that this statement substantiates a claim of sexual harassment. Nor does the court find that

the statement to Bishop by plaintiff, if indeed made, was rude or conduct unbecoming a

federal employee.

**Specification 2** The appellant is charged with asking Ms. Bolton to promote
him so that someone with less experience (Ms. Bishop) would not be ahead of
him on the retention register.

Bolton testified she did not consider this to be an EEO matter. H.R. 129. The

plaintiff testified he told Bolton he should have been promoted. H.R. 845. Bolton testified

there was nothing unethical or illegal about an employee asking his supervisor that his job

be upgraded. H.R. 143-144. However, Bolton testified the plaintiff stated she should have

taken into account the effect their performance appraisals would have on the retention

register and that this suggestion by plaintiff required her to do something unethical or illegal

as it involved manipulating the appraisal system. H.R. 116.

The AJ found that the appellant was improperly asking Ms. Bolton to manipulate his

retention standing in the event of a RIF by inappropriately taking into account

personal considerations. Initial Decision at 34. This court disagrees. The plaintiff asked

Bolton to consider his military service. She told him it did not count. While the plaintiff was

clearly expressing frustration at being ranked lower for retention purposes than someone with

a lower grade, this court can find nothing sinister in the plaintiff's questions to Bolton.

Plaintiff was told such considerations would be inappropriate and there is no evidence he

ever requested that such things be considered again. The AJ's finding sustaining the specification is in error.

### 4. Specifications Relating to Janet Odom

**Specification 1:** The appellant was charged with questioning Ms. Odom in 1992 about her education ability and skills in a derogatory and patronizing manner.

Odom testified she and plaintiff were hired about the same time, and that plaintiff inquired as to her educational background. H.R. 38. Odom testified these conversations occurred sometime between the summer of 1992 and early 1993. H.R. 39; 46. The plaintiff testified Odom did not seem offended by his comments about her grades. H.R. 813. During this same time she testified that as she walked through the halls, she heard the plaintiff making comments about the internship program, of which she was a part. H.R. 45. She believed the plaintiff had an "inherent derogatory tone" and she was uncomfortable. H.R. 40. However, she admitted that plaintiff and another male employee, Barry Fagan, were having to fight for training slots because they were all being given to the interns.[39] H.R. 71-72, 80-81. She believed that in February or March, 1996, she went to her supervisor, Mike Demming, because of discussions about her being teamed with plaintiff. H.R. 43, 62-63.

---

[39] She testified available training slots were supposed to go to the most senior person first. She alleged plaintiff never complained about training. H.R. 110. Bolton stated the scholar intern program was run out of the Atlanta office and that office set the interns's training program and performed their first year evaluations. Bolton had no input as to whether Bishop was hired. H.R. 112.

She stated she found the plaintiff to be condescending toward women and argumentative. H.R. 63.

While the agency established by a preponderance of evidence that the plaintiff questioned Odom about her academic background, a preponderance of evidence does not support a finding that this was done in a "derogatory and patronizing manner" and as such this court finds that the AJ's sustaining of the specification was in error. This court also finds that the events in question in this specification were three to four years before the plaintiff was terminated and, as such, questions their relevance to the proceeding.

> **Specification 2:** The Appellant is charged with making unwelcome comments about Ms. Odom's single status, i.e., asking her about her activities, boyfriend status, financial status in regard to her being single, finding a man to support her, etc., from late 1993 through 1994.

Ms. Odom alleges the plaintiff, in 1993, asked her about her dating habits and commented it must be nice to have her salary with no dependents. H.R. 49. Although she testified she found these questions invasive, she did not tell plaintiff this. H.R. 50. She did not initiate a complaint. H.R. 51. Bolton testified she knew the plaintiff set up blind dates for people. H.R. 135.

In 1995, after Odom got married, the plaintiff questioned her about what her husband did for a living. H.R. 54. Odom and Bishop are friends. H.R. 64. The plaintiff states Odom did not seem offended by these questions at the time. H.R. 820.

Sandra Edwards testified she worked with the plaintiff and she considered him to be a good worker. H.R. 710. She stated she and other single women would tease the plaintiff about his finding "nice men" for them. The plaintiff tried to accommodate their requests. H.R. 710. She found this action by plaintiff to be offensive. H.R. 711. She did not tell plaintiff not to do this again. H.R. 711.

The AJ found that the comments to Odom were not based on her sex and thus did not further consider the specification with regard to the sexual harassment claim. However, the AJ did find these actions to be rude and conduct unbecoming a federal employee and to that extent sustained the specification. Initial Decision at 38-39. This court finds this conclusion is supported by substantial evidence. However, this court can find no basis for the conclusion that this action rises to the level of a terminable offense or conduct requiring plaintiff's termination.

### C. Whether the Plaintiff Engaged in Comments or Actions of a Sexual Nature

While this court agrees to some extent with the AJ that some of the plaintiff's behavior, detailed above, was rude and unbecoming, this court in no way finds any evidence to support a conclusion that the plaintiff's conduct was of a sexual nature under any definition used. Clearly, from the evidence, the plaintiff did have a problem with Bishop. However, evidence not mentioned by the AJ sheds light on the basis for the ongoing conflict.

Ms. Bishop was asked specifically by Bob Pacheco if the plaintiff had made sexual advances towards her and she said no. H.R. 403-4, 459. She testified "He said that he felt

42

maybe this wasn't sexual harassment, and I disagreed with Mr. Pacheco, stating that Morris seemed to have a resentment toward women in the workplace, competing with women on the job." H.R. 459, 549.[40] This was sometime in the summer or the second half of 1995. R. 404, 459. In March, 1996, Ms. Bishop was again told that her duty station was Birmingham and she could not work out of the Gadsden office and that her continuing to do so was inappropriate. H.R. 480, 481. She testified that "At that point I pretty much knew where the complaint had come from." H.R. 480.[41] She was investigated for time and attendance issues in the early part of 1996. H.R. 236.

Not until late May, 1996, did Ms. Bishop talk to Colonel Pulscher about her concerns. H. R. 633, 677. Hank Siegel, Pacheco and Tucker were there. H.R. 634. Bishop testified at that time she gave him a "list of things" that she had noted over a period of two years. H.R. 461, 546; Exhibit E. Pulscher testified that Bishop gave him nothing in writing to support her allegations at that time. H.R. 634. She subsequently provided him the list. She typed this list, according to her testimony, in September, 1995, but did nothing with it until

---

[40]This court notes that the entirety of Ms. Bishop's testimony of fear and anxiety caused by the plaintiff is based on her beliefs of what the plaintiff seemed to be thinking. While the court is impressed with Ms. Bishop's psychic abilities, the court declines to credit them as accurate statements of the plaintiff's motivations.

[41]Although relevant, the AJ ruled that she would not take testimony regarding Bishop's "reporting to Gadsden, what the circumstances were of her reporting to Gadsden, whether she was engaging in fraudulent time and attendance reporting, whether she was misusing a Government vehicle ... Ms. Bishop is not on trial here, and there will be no further questions along that line." H.R. 318-319. The court finds this ruling to be substantial error. Clearly, if Bishop was doing what the plaintiff accused her of doing, she had a very strong motive to lie about the plaintiff's harassment of her.

May, 1996 when she was asked by Pulscher to update it through a letter to her dated June

1, 1996. H.R. 461; 537. She further states that she actually started the list in late 1994. She

chopped up her notes she claims she kept for that entire period when she typed the list in

September, 1995. H.R. 462.[42] At Pulscher's request, an investigator, Buddy Gardner, was

sent in June, 1996. H.R. 465; 635-636. Ms. Bishop elaborated on this list in speaking with

Gardner. H.R. 466. After this, Ms. Bishop spoke with "a lady from the EEO in Boston."

H.R. 468. Bishop's EEO complaint contained three allegations against plaintiff, those being

phone calls to her home, stalking, and looking over her partition. H.R. 877-878. The

plaintiff denied each of these allegations. H.R. 877-878.

Ms. Bishop concludes that "I feel that Mr. Plaisance harbors a resentment toward

competing with women in the workplace, and I feel like that resentment spilled over and

created an intimidating and hostile work environment." H.R. 471. However, this same

witness testified that the plaintiff visited with Donna Storey, a women, in Ms. Storey's office

and that he was helping Donna learn his job.[43] H.R. 519-520. This clearly supports a finding

---

[42]The court notes Ms. Bishop, according to her testimony, spent a year and a half keeping notes and making a list of events concerning the plaintiff, of whom she was afraid, but showed the self-restraint to not reveal this list, or even mention its existence, to anyone until May, 1996. The court notes Ms. Bishop's excellent organizational skills since the evidence is that the entire office was relocated to another building in April, 1996, yet she was able to keep her list accurate, current and at hand during this time. H.R. 400, 563. *See* Exhibit E. Bishop did not file a formal EEO complaint until July, 1996. H.R. 303. Her informal complaint was made March 21, 1996 (H.R. 315), within a few days of plaintiff's sending a letter to Pulscher stating that Bishop was filing false travel vouchers.

[43]Donna Storey is a contract administrator with defendant and a co-worker of plaintiff. H.R. 742.

that the plaintiff did not have an animosity directed toward all women, but only toward Ms.

Bishop, whom he believed was violating work place rules and reported her for the same.

Leigh Ann Patton testified she was hired in the outstanding scholars program and she

worked next to the plaintiff's office in April, 1996.[44]  H.R. 737.  She was asked by Gardner

if she had any complaints about the plaintiff and responded no.  H.R. 739.

Donna Storey testified she was hired at the same time as plaintiff.  H.R. 742.

Eventually, she and the plaintiff switched jobs to rotate administrators into the financial field.

H.R. 742-743.  She had problems with Bishop's work habits and complained on several

occasions, to her supervisor, Mr. Graham, and to Jim Brown, but nothing was done about it.

H.R. 743, 748, 759.  *See also* statement of Storey, defendant Exhibit E.[45]  Storey testified she

too monitored Bishop's attendance, because she was having to answer Bishop's phone for

her.  H.R. 748, 749.  The plaintiff never asked her to monitor Bishop's attendance, but she

did provide him information about Bishop's attendance.  H.R. 749, 753.  Storey actually

went to plaintiff complaining about Bishop never being at work on time.  H.R. 761.

---

[44]During the time in question, Leigh Ann Patton was a contract management specialist in the intern program.  She became a contract administrator.  H.R. 737.

[45]Storey's statement, defendant Exhibit E, echos plaintiff's in that she noticed Bishop not coming to work, asked her supervisor where Bishop was, and could not get a straight answer. She also alleges that she overheard a conversation between Pacheco and Zealy in May, 1996, before the move to the new building, that management was not happy with plaintiff's behavior and that they would have to deal with it.  Statement of Storey.

Storey also stated that in May, 1996, she overheard Pacheco on the phone saying that plaintiff's behavior was getting out of hand and something had to be done. H.R. 749. Storey said she never had any problem with the plaintiff. H.R. 750.

William Matthews testified the plaintiff had come to him for help because he was a union steward.[46] H.R. 769. Matthews told the plaintiff to keep a record or file of things that were said, when they were said, by whom and to list any witnesses. H.R. 769, 829. He noticed whenever he was talking to plaintiff, people would intentionally, casually stroll by, leading him to the belief that such strolls were to monitor the conversation. H.R. 769-770. Lake Tate, Bolton's husband, was one such stroller by as was Eric Shratter. H.R. 770-771. Matthews stated his boss, Hank Siegel, would also stroll by and later make threatening gestures towards him. H.R. 771-772. Matthews stated Siegel told him "you're history" and "you're gone." H.R. 772. Siegel alleged that this was stated in a joking manner.[47] H.R. 982; 984.

Additionally, Valerie Hardy told Matthews that Shratter, her boss, threatened her.[48] H.R. 773. Shratter wanted Hardy to write a statement defaming plaintiff and Hardy was

---

[46]William Matthews handles package inspections in the Birmingham office. H.R. 768. He was also a union steward. H.R. 769.

[47]The court is unable to find a difference between Siegel's "joking" with Matthews and plaintiff's "joking" with Bishop and Zealy, except that Siegel is still employed and plaintiff is not. *See* Initial Decision at 48, fn. 25. Apparently, Siegel's inappropriate comments are not cause for dismissal although the plaintiff's were. This court can find little to distinguish the two.

[48]Valerie Hardy was the secretary to Eric Shratter at the time in question. Defendant Exhibit J, deposition of Hardy, at 4. Shratter was the Chief, Operations Support Area. *Id.*

46

frightened. H.R. 773, 776. Matthews reported Shratter's threats to Tucker. H.R. 775. Hardy stated that the plaintiff never asked her for any information which would violate the Privacy Act, nor did she ever give him anyone's time sheets. Exhibit J (depo. of Hardy) at 9-10. Hardy testified that Shratter told her to write a statement that the plaintiff was harassing her and she refused to do so because it was not true. Depo. of Hardy at 12-13. *See also* statement of Hardy, attached as plaintiff's exhibit 1 to defendant's exhibit J.

Hycentha Hodge supervised the plaintiff as a team leader.[49] H.R. 781. She was consulted regarding his 1995-1996 performance evaluation. H.R. 781. She described the plaintiff's interaction with co-employees as friendly, cooperative and talkative. H.R. 781-782. Hodge testified she never saw him engage in rude behavior, never heard anyone complain about his matchmaking efforts and never had occasion to discipline him or recommend he be disciplined. H.R. 782, 799. She would have no problem with the plaintiff being returned to her team. H.R. 791. In May, 1996, the plaintiff was transferred off her team. H.R. 783.

Given the above testimony, this court finds that the plaintiff worked with numerous women with whom he got along fine. Only Bishop, Bolton, Zealy and Odom seemed to have severe problems with the plaintiff. Bishop underwent an investigation for fraudulent reporting of time and use of a vehicle due to plaintiff's allegations. Bolton was the supervisor who allowed Bishop to report to Gadsden in spite of her duty station being

---

[49]Hodge's title during this time was "administrative contracting officer." H.R. 780.

47

Birmingham. Zealy was found to be unbelievable by the AJ. Odom had only two real complaints about the plaintiff, one from questions in 1992 and the other regarding his inquiries about her marital status, which ceased when she got married, lending support to the plaintiff's allegation he wanted to "fix her up" with somebody.

Given this background to the allegations, and considering the allegation of sexual harassment with regard to the "totality of the circumstances" and not in a "vacuum" (Initial Decision at 40), this court finds the AJ's finding that these comments were "sex-based" (Initial Decision at 43) to be wholly unsupported. However, this court agrees that the comments were unwelcome. This court notes the difference between making comments to a co-employee who happens to be a woman and making comments to a co-employee because she is a woman. This court finds that only the former applies to the allegations here. This court sees no evidence to suggest that if Ms. Bishop were a man, the plaintiff would have engaged in different behavior with regard to his claim of unfairness for working from the Gadsden office. While the effect on the listener is of paramount importance, that effect still must have some basis in reality. *See Newton v. Department of Air Force*, 85 F.3d 595, 599 (Fed. Cir.1996).

The agency is unable to show that but for Bishop's being allowed to abuse the system by getting special privileges no one else got and Pulscher admitted could not continue, the plaintiff would have cared when she came to work or when she left. Similarly, this court cannot find an observation that all of his supervisors are women to be akin to a finding that

this is a sex-based comment. It is a statement of fact. Plaintiff did make other disparaging remarks about his likelihood for promotion, but this court finds while they were rude, they cannot be considered sexual harassment under any definition.

Furthermore, this court found the AJ's sustaining of specifications 3, 4, and 5 with regard to Bishop to be in error and thus does not consider these in considering whether the AJ reached a factually supportable decision.

The substance of the charges the AJ believed supported her finding that the plaintiff's comments were sex-based were that the plaintiff told Fagan (1) Bolton liked Bishop better than him; (2) he was tracking Bishop's time; and (3) complaining to Fagan about Bishop on a daily basis. This court specifically finds that, while these statements to Fagan about Bishop were made, her sex was not the cause of them. Rather, the plaintiff's belief Bishop was receiving special benefits and being allowed to falsify her time and government car usage was the driving force behind his continual complaints to Fagan.

Furthermore, this court finds that Specifications 8 and 9, while factually sustainable, do not lend support for sex-based harassment. The plaintiff's possession of Bishop's time sheets clearly supports his claim that she was abusing time and vehicle usage reporting. The plaintiff filed an EEO charge because of his belief Bishop was allowed to do so by her superiors. *See* March 13, 1996 Complaint of Plaintiff. Similarly, the elevator staring incident which forms the basis for Specification 9 can hardly be considered as sex-based harassment. This incident occurred after the investigation of Bishop's time reporting was

49

begun and she, in return, filed complaints of harassment against the plaintiff. Supporting this court's finding is that Hauschild found the plaintiff's claims regarding Bishop to be well-founded, and communicated the same to Pulscher. H.R. 665.

Furthermore, this court finds the AJ's interpretation of the evidence to establish what the plaintiff did or did not believe to be arbitrary and capricious, as well as irrelevant. See Initial Decision at 41 ("he undoubtedly believed that he would not be promoted as long as she worked there"). While the plaintiff did go after Bishop, this court finds no evidence to support the AJ's finding it was because of her status as a woman and not because she was abusing the system and being allowed to do so by her female boss.[50]

Similarly, the AJ found that the plaintiff believed that women hired through the outstanding scholar program were given preferential treatment. Initial Decision at 43. Again, this court notes that the AJ's interpretation of the plaintiff's beliefs is inappropriate, not only as a basis for a harassment charge, but for anything else. The plaintiff is entitled to hold any beliefs he wishes, no matter how distasteful to the rest of society. Regardless of what the plaintiff did or did not believe, only his actions may be considered as a basis for his termination on the grounds of the specifications.

---

[50]The AJ makes much of the fact that plaintiff claimed many comments were made in a joking manner, which she did not believe. This court finds that plaintiff's claim of "joking" at least as credible, if not more so, than Siegel's similar claim in telling Matthews "you're history" and "you're gone." H.R. 772, 982, 984.

The evidence supports the finding that the plaintiff made derogatory comments to women and about women, but not based on their status as females. The plaintiff may have believed he could not be promoted because he is not female, and if he did, he is entitled to hold this belief. As stated above, the agency established by a preponderance of evidence that the plaintiff questioned Odom about her academic background. However, a preponderance of evidence does not support a finding that this was done in a "derogatory and patronizing manner." This court also finds that the plaintiff asked Odom about her academic background three to four years before he was terminated. Perhaps the plaintiff believed he was smarter than Odom, and therefore questioned her grades. Highly speculative, but no more so than assuming he did so because she was female. It would be just as inappropriate for this court as for the MSPB to base its decision on an "interpretation" of plaintiff's beliefs.

As this court noted earlier, the plaintiff does not have to like working with women, although the court also finds that the plaintiff worked with plenty of women with no problems. As such, this court is unable to find that the allegations of Bishop, who did "have an ax to grind" in the words of the AJ, and Odom, who was friends with Bishop, support a finding of sex-based harassment. *See* Initial Decision at 43. For these reasons, this court finds the decision of the AJ "that the specifications summarized in this section were sex-based, unwelcome, deliberate and repeated. For that reason, the charge of sexual harassment under the agency's regulation is SUSTAINED" to be against the substantial weight of the evidence presented, arbitrary, capricious and therefore in error. "Congress has instructed this

court to reverse a decision of the Board that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law... or unsupported by substantial evidence." *Marano*, 2 F.3d at 1141; *citing* 5 U.S.C. § 7703(c)(1988). Therefore, this court finds no option other than to reverse the decision of the AJ, as the only conclusion this court can draw is that the plaintiff's disclosures were a contributing factor to Pulscher's decision to remove him from the building.[51] Although this court does find the plaintiff's behavior was rude and conduct unbecoming a federal employee, no evidence is before this court that this behavior, without the plaintiff's disclosure, would have caused his termination.[52] On this basis, the decision of the AJ is reversed.

---

[51]*See e.g.* plaintiff's statement dated 24 June 1996, defendant's Exhibit E, which states that, upon returning from annual leave, he was asked by co-workers why he was at the office and whether he was on administrative leave. This court notes the plaintiff alleges this occurred before the elevator incident with Zealy. The same statement also alleges that plaintiff was being criminally investigated, beginning on June 10, 1996, the date he began his annual leave. This statement was made pursuant to an EEO complaint by plaintiff, alleging reprisal for his March 18, 1996, March 27, 1996 and May 9, 1996 EEO complaints.

[52]This court finds that the defendant drew upon a half dozen to a dozen isolated incidents spanning four years to support its decision to terminate the plaintiff. However, none of these incidents, alone or in combination, were considered to be worthy of any discipline at all until after the plaintiff filed his EEO complaint in early 1996 which caused an investigation of Bishop to be undertaken. While Bishop did not have the authority to terminate the plaintiff, she and Zealy clearly had the ear of Pulscher. "A typical case under the WPA involves an employee blowing the whistle on certain practices observed in the workplace, such as misuse of government funds or grossly wasteful practices. Since rectifying such conduct would not normally involve taking a personnel action against the whistle blower, an proximate personnel action taken against the employee would immediately demand attention as a potential violation of the employee's rights under the WPA." *Marano*, 2 F.3d at 1142. This court finds the coincidences which must be accepted to find no retaliation on the part of the agency a little too great to overcome the convenient timing of the events here.

The incident for which plaintiff was removed occurred on June 24, 1996, when Zealy started to get on an elevator the plaintiff was already on and he asked if she was sure she wanted to get on the elevator with him.[53] Apparently she was not, because she testified she stepped back and took the stairs instead. H.R. 573, 583-584. She was crying and shaking so she walked into Pulscher's office and told Sandy Fowler. H.R. 574, 638-639. Pulscher testified Zealy was an emotional wreck and spent five minutes composing herself before she could speak coherently. H.R. 638. She reported to Pulscher she had been threatened by plaintiff. H.R. 639. Colonel Pulscher at that point apparently told Major Ellery to escort the plaintiff from the building. H.R. 575, 640. Pulscher stated he was convinced Zealy felt threatened by the conduct and actions of the plaintiff and was genuinely fearful as to her safety.[54] H.R. 640. Tucker testified Pulscher stated he had the plaintiff removed because "people out on the floor were scared of Mr. Plaisance, and he had to do something." H.R. 263. No one asked the plaintiff to respond to Zealy's allegations. H.R. 250. Zealy admits the plaintiff never verbally threatened her or her family. H.R. 617. She believed he disliked her. H.R. 619.

---

[53]Jackson testified this would have been a violation of his instruction to Zealy to avoid the plaintiff. H.R. 346. The plaintiff stated he asked this question because if Zealy was getting on the elevator, he was getting off. H.R. 867.

[54]This court notes the vast difference between Zealy feeling genuinely afraid and the more relevant question of whether a reasonable person in Zealy's shoes would have acted so emotionally to, at most, a mean spirited question.

The plaintiff was thereafter placed on administrative leave and then terminated. H.R. 640. The termination was proposed by Hank Siegel, in reliance on Gardner's investigation.[55] H.R. 641; defendant Exhibit E. The plaintiff denied each allegation, in August 1996, including the one finding physical contact with Zealy.[56] H.R. 642; 644. *See also* "Memorandum for Commander" dated "21 Mar 1996". The plaintiff consistently stated his removal was in reprisal for his protected activities. H.R. 647.

Evidence in the record supports a finding that the plaintiff believed he was being set up. Different people in the office, including Hodge, told him this. H.R. 870. Further, the plaintiff testified that Pulscher accused the plaintiff of completely false charges to get him to drop his EEO complaint. H.R. 870. He took this as a threat. H.R. 871. The plaintiff testified that at the March 13, 1996 meeting, Pulscher stated he was conducting an illegal investigation and harassing women. H.R. 871. The plaintiff also said women in the office told him they had been asked for statements about him. H.R. 872.

Eric Shratter testified that Val Hardy was his secretary and he asked her to provide a statement to him with regard to plaintiff. H.R. 963-964. He alleged Hardy relayed her concerns that the plaintiff had been asking her for information, which made her

---

[55]According to Tucker, Gardner handled many investigations. Tucker knew of no instance where Gardner did not find cause to discharge. Tucker had previously accused Gardner of bias and manipulation of an investigation which similarly involved Birmingham management. H.R. 238-239, 260.

[56]Interestingly, the AJ stated of the plaintiff's letter to Pulscher, denying all charges against him, "I don't know that it's really relevant...." H.R. 643.

54

uncomfortable. H.R. 964. Shratter stated Ellery recommended he ask Hardy for a statement. H.R. 967. However, Shratter was unable to articulate what information plaintiff was requesting from Hardy. H.R. 969. The court finds Shratter's testimony to be noncredible and in contravention of Hardy's deposition testimony. He testified that he could not say whether he received an e-mail from Hardy stating she would not participate in any fraud in timekeeping, but after seeing the same, could "vaguely remember something like this." H.R. 972, 976. However, he does recall being asked to investigate plaintiff's allegations in his EEO complaint regarding Bishop's timekeeping. H.R. 973. He found no fraud in Bishop's records. H.R. 974. He was concerned that Hauschild was speaking with the plaintiff. H.R. 975.

As explained above, this court finds the agency's evidence in support of its termination action against plaintiff to be quite weak, depending on isolated incidents spanning four years that none of his supervisors found worth disciplining the plaintiff for. While this court does not find a strong motive to retaliate against the plaintiff on the part of Pulscher, the court does find such on the part of Bishop and perhaps Zealy. These two women clearly had Pulscher's ear and Pulscher chose to believe them without ever asking the plaintiff for his version of particular events. Siegel had previously threatened Matthew, and did not like the plaintiff conferring with Matthew regarding his EEO claim. This court finds that the plaintiff's protected activity labeled him as a troublemaker and therefore, Pulscher and Siegel wanted the plaintiff gone.

In addition, from the evidence, the court finds that the agency in question had an amazing gossip mill and employees who apparently all checked up on each other constantly, yet only the plaintiff was subject to any discipline. Still further, the AJ found Zealy's testimony to be unbelievable and refused to consider it, yet it was the Zealy elevator incident for which plaintiff was escorted from the building and which led to his ultimate termination. As such, the court finds that the defendant wholly failed in its burden to establish by clear and convincing evidence that the plaintiff would have been terminated even if he had not filed EEO complaints and otherwise engaged in protected activity. *See Carr*, 185 F.3d at 1323. *See also Russell v. Department of Justice*, 76 M.S.P.R. 317 (1997).

## E. Whether the Plaintiff's Comments/Actions Created a Hostile Work Environment

The AJ, for reasons unknown, refused to follow the framework set forth in *Pope v. U.S. Postal Service*, 114 F.3d 1144 (Fed. Cir.1997) for analyzing a hostile work environment claim.[57] This court finds the AJ's failure to apply the standard set forth in *Pope* is reversible error. However, because this court finds that substantial evidence does not support the AJ's finding of sexual harassment, the question of whether these actions created a hostile environment need not be reached. Only if this court found support for the AJ's finding of

---

[57]*See* Initial Decision at 44, n. 22. *See also Pope*, 114 F.3d at 1149 ("Because our creation of the second presumption represents a change in the law from that which existed during Mr. Pope's hearing before the Board, we remand this case to the Board for further proceedings"). The AJ found this case was not applicable because it was published after her hearing but before her opinion issued. This court fails to see the distinction.

sexual harassment would a remand be necessary for the AJ to hold an additional hearing so that the plaintiff could present the evidence to which he is entitled under *Pope*.[58]

However, because this court finds no evidence to support a finding of sexual harassment on the part of the plaintiff, the court need not address the standard to apply to determine whether such non-existent sexual harassment created a hostile environment.[59]

The AJ used the plaintiff's staring at Bishop to form the basis for her conclusion of a hostile work environment. *See* Initial Decision at 45. This court finds that all of the incidents about which Bishop complains the plaintiff stared at her, taken together are not severe enough or pervasive enough to constitute sexual harassment in the Eleventh Circuit. In *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246-1248, (11th Cir.1999) the court conducted an in-depth review of sex-based harassment cases where the conduct was found to be neither severe nor pervasive. This court notes that each of the listed cases contained behavior much more disturbing than that at issue here. In *Mendoza*, the Court stated that aside from "constant" following and staring, the conduct asserted was not frequent. *Mendoza*, 195 F.3d

---

[58]In *Pope*, the plaintiff was alleged to have touched and rubbed the head, neck, shoulders, and arms of a female employee as well as position himself so that the breasts of two female employees would rub against him. Pope was demoted, not terminated. *See Pope v. United States Postal Service*, 114 F.3d 1144, 1146 (Fed. Cir.1997).

[59]The court notes that the work environment at issue was indeed hostile, however, no evidence supports a finding that this hostility was created by the plaintiff's non-existent sexual harassment. Rather this court finds more likely from the evidence that Bishop was irate that the plaintiff turned her in for false timekeeping and in revenge, Bishop escalated her campaign against the plaintiff. The court finds Bishop's posture as an innocent victim in all this to be laughable.

at 1249. This court concludes that, even if the agency had sufficient evidence to establish

sex-based harassment, in this Circuit, staring behavior is not sufficient to create a hostile

work environment.[60]

The AJ found that "while there is animus between the two of them and Ms. Bishop

was clearly upset at the constant attacks by the appellant,[61] his constant staring, his

inappropriate remarks, and his general resentment of her success, which he freely voiced in

the workplace, I cannot agree with the appellant that Ms. Bishop was simply striking back

at him to avoid having to answer his attacks." Initial Decision at 46. This court finds even

if evidence existed to support this statement, all of these actions collectively, spread over four

years, are not sufficient to create a hostile environment. This court knows of no law, rule,

regulation or any precedent which required the plaintiff to be polite to Bishop, which seems

to be what the AJ thought was required.[62]

---

[60]In *Mendoza*, the Court stated "Given normal office interaction among employees the
following and staring in the manner described by Mendoza are not the type of conduct that can
render Mendoza's claim [for sexual harassment] actionable, even with evidence that the
following and staring were 'constant' and thus 'frequent' under the *Harris* factors. 195 F.3d at
1249. Given that the plaintiff's behavior would be insufficient to establish a hostile work
environment claim under Title VII, this court finds the same evidence must be insufficient to
establish a hostile work environment claim under the standard adopted by the AJ of "it is the
overall, composite effect on the terms, conditions, and privileges of employment that is the focus
of the law, whose target is workplace discrimination" as this is the same standard. *See* Initial
Decision at 44; *Mendoza*, 195 F.3d at 1245 ("an employee must show .... the harassment must
have been based on the sex of the employee; (4) that the harassment was sufficiently severe or
pervasive to alter the terms and conditions of employment ...").

[61]This court can find no evidence of "constant attacks".

[62]Even if this court could find evidence to support the AJ's finding of a hostile
environment, it is unable to find such hostility was aimed at Bishop because she was female. By
analogy, this court finds applicable Judge Edmondson's statement in his concurring opinion in

The AJ makes the broad conclusion that "There can be little doubt that the appellant's sex-based comments and actions altered the terms, conditions and privileges of Ms. Bishop's employment. I must conclude, therefore, that the agency proved that the appellant's words and conduct created a hostile work environment." Initial Decision at 46. The Court in *Mendoza* stated "conduct which is much more severe and pervasive than the conduct shown by Mendoza has been found insufficient as a matter of law to sustain hostile-environment claims." *Mendoza*, 195 F.3d at 1252. For the reasons set forth above, the court finds the AJ's conclusion to be in error, resulting from a misapplication of the law. Compared to the conduct alleged as insufficient in that case, the court finds the allegations here to be no more than a mere nuisance.

## F. Penalty Imposed

This court finds the only sustainable specifications include several specific instances in which the plaintiff engaged in behavior which was either rude or unbecoming conduct. This court finds the penalty of termination for rude behavior or for behavior unbecoming to a federal employee to be vastly out of proportion to the actual conduct in which the plaintiff engaged. *See Douglas*, 5 M.S.P.R. at 303 ("Further OPM has specifically counseled agencies that: Any disciplinary action demands the exercise of responsible judgment so that an employee will not be penalized out of proportion to the character of the offense; this is

---

*Mendoza*, that "Title VII was never meant to protect employees from all unpleasant and rude conduct in the workplace." *Mendoza*, 195 F.3d at 1253.

particularly true of an employee who has a previous service record of completely satisfactory service").

On appeal, the AJ's affirmance of the agency's choice of penalty "will not be disturbed unless it is so harsh and in appropriate as to exceed the agency's discretionary authority." *Newton*, 85 F.3d at 599; citing *Carosella v. United States Postal Serv.*, 816 F.2d 638, 643 (Fed.Cir.1987); *DeWitt v. Department of the Navy*, 747 F.2d 1442, 1445 (Fed.Cir.1984), *cert denied*, 470 U.S. 1054, 105 S.Ct.1759, 84 L.ED.2d 822 (1985). This court has the authority to mitigate penalties which are unduly harsh. *Douglas*, 5 M.S.P.R. at 290-291. The court having found that a preponderance of the evidence before the Board did not support specifications, this court can only conclude that the specifications did not support the termination of the plaintiff. *See id* at 296-297 ("Thus an adverse action may be adequately supported by evidence of record but still be arbitrary and capricious, for instance if there is no rational connection between the grounds charged and the interest assertedly served by the sanction" citing *Doe v. Hampton*, 566 F.2d 265, 271-72 n. 15 (D.C.Cir. 1977); *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974)).

The MSPB here had a duty to exercise a scope of review adequate to produce results which are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law when reviewed by this court under 5 U.S.C. §7703(c). The MSPB was required to "review the agency's penalty selection to be satisfied (1) that on the charges sustained by the

60

Board the agency's penalty is within the range allowed by law, regulation, and any applicable

table of penalties, and (2) that the penalty 'was based on a consideration of the relevant

factors and [that] ... there has [not] been a clear error of judgment." *Douglas*, 5 M.S.P.R. at

301; citing *Citizens to Protect Overton Park, Inc. v. Volpe*, 401 U.S. 402, 417, 91 S.Ct. 814,

824, 28 L.Ed.2d 136 (1971).

A number of relevant factors have been identified as relevant for consideration in

determining the appropriateness of a penalty.  These are set forth in *Douglas, supra,* and

include the following:

(1) The nature and scope of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional, technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

(2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public and prominence of the position;

(3) the employee's past disciplinary record;

(4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

(5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties;

(6) consistency of the penalty with those imposed upon other employees for the same or similar offenses;

(7) consistency of the penalty with any applicable agency table of penalties;

(8) the notoriety of the offense or its impact upon the reputation of the agency;

(9) the clarity with which the employee was on notice of any rules that where violated in committing the offense or had been warned about the conduct in question;

(10) potential for the employee's rehabilitation;

(11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and

(12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

This court considered each of the above factors before determining that the penalty imposed here greatly outweighs the offenses of the plaintiff. This court finds that, at worst, the plaintiff engaged in behavior which was rude. Furthermore, while some of the alleged behavior of the plaintiff could be seen as intentional and even malicious and repeated, this court finds that even repeated acts of rudeness are not sufficient for termination without repeated warnings, at a minimum. While some sanction could have been imposed against the plaintiff for such rudeness, in no manner did the plaintiff's behavior rise to the level of a terminable offence.

The plaintiff was not in a supervisory or fiduciary role, and had limited contact with the public. The plaintiff had an extremely limited past disciplinary record, being two counseling sessions in March, 1996, stemming form Bishop's and Zealy's complaints about the plaintiff after an investigation of Bishop's activities was undertaken. As shown by previous performance evaluations (which Pulscher never even reviewed) the plaintiff

performed his job better than satisfactorily, got along with most co-workers, male and female, without problem, and had no complaints from supervisors about his job performance.

While testimony was given to the effect that no other similar disciplinary actions had been taken due to a lack of similar offenses, this court finds that at least one such similar offense (being rude behavior had occurred and no disciplinary action was taken). No evidence of the appropriate penalty for rudeness was introduced into evidence by the agency, although rudeness was one of the specified offenses for which the plaintiff was terminated, and hence this court finds that the plaintiff could not have been placed on adequate notice that he would be terminated for continued rudeness.[63] Lastly, this court finds a variety of mitigating factors which should have been, but were not, considered by the agency or the AJ. The finding of good cause to investigate Bishop's reported abuse of time and attendance records is one such mitigating factor. The finding that Zealy's testimony was found not credible by the AJ is another such factor. Additionally, the excellent performance evaluations the plaintiff received are another factor, as is the fact that the plaintiff seemingly got along fine with other employees, male and female. Furthermore, the fact that Bishop did nothing about the alleged behavior of plaintiff for more than two years also mitigated against the sustaining of the penalty imposed, as does Bishop's motive for retaliation against the plaintiff, which the AJ failed to ever mention, let alone consider.

---

[63]The court finds similar action on the part of Siegel when he "jokingly" told Matthews that "he was history", but no action against Siegel for his rudeness was taken by the agency.

This court also questions the AJ's sustaining of the penalty imposed against the

plaintiff when the AJ found many of the specifications against the plaintiff to be

unsustainable. In *Douglas*, the court stated that:

> An agency may establish a prima facie case supporting the appropriateness of
> its penalty by presenting to the Board evidence of the facts on which selection
> of the penalty was based, a concise statement of its reasoning from those facts
> ir information otherwise sufficient to show that its reasoning is not on its fact
> (sic) inherently irrational, and by showing that the penalty conforms with
> applicable law and regulation .... [W]hen the appellant challenges the severity
> of the penalty ... the agency will be called upon to present such further
> evidence as it may choose to rebut the appellant's challenge ...
>
> Whenever the agency's action is based on multiple charges some of which are
> not sustained, the presiding official should carefully consider whether the
> sustained charges merited the penalty imposed by the agency. In all cases in
> which the appropriateness of the penalty has been placed in issue, the initial
> decision should contain a reasoned explanation of the presiding official's
> decision to sustain or modify the penalty, adequate to demonstrate that the
> Board itself has properly considered all relevant factors and has exercised its
> judgment responsibly.

*Douglas*, 5 M.S.P.R. at 308. This court finds, after a review of all of the evidence presented

and consideration of all relevant factors, both the agency and the AJ failed to meet the burden

as set forth in *Douglas*. The agency failed to consider the majority of the factors listed in

Douglas, and failed to articulate what factors it did consider before terminating the plaintiff.

The court finds the agency action to be in violation of its own regulations which state:

> The Table of Offenses and Penalties is intended as a suggested guide for the
> selection of penalties for certain offenses. The decision on what penalty is
> appropriate for a particular offense should be made considering the following:
>
> a. The Douglas factors outlined below...

DLA Regulation No. 1406.1 at 3, submitted in defendant Exhibit E. This regulation further

states:

> A removal is generally an action of last resort. It is usually taken when
> corrective action has ben tried without result, or the situation is of such gravity
> as to indicate that correction and retention of the employee is inappropriate.
> Ordinarily, before it is proposed to remove an employee, progressive
> disciplinary measures will have been taken to achieve correction. It must be
> determined that the removal is warranted to promote the efficiency of service."

DLA Regulation No. 1406.1 at 5. This court finds no evidence that the efficiency of service

was ever considered by the agency or the AJ. Nor can this court find any evidence to support

a finding that the efficiency of service ever suffered. The AJ merely compounded this

situation by failing to sustain numerous specifications, but then adopting the agency's

action.[64]

Additionally, this court finds that Pacheco had a motive to retaliate against the

plaintiff for the OSC complaint plaintiff filed in January, 1996. This court can find no

evidence to support a finding that the plaintiff was aware that he could be terminated for

rudeness.[65]

---

[64]The mere fact that the agency followed the appeal process slowly and methodically does
not correct the compounded errors which resulted in the agency decision being rubber stamped.
The amount of time an appeal takes is unrelated in any sense to the appropriateness of the
decisions made or actions taken.

[65]In fact, the Table of Offenses and Penalties states that "rude, discourteous conduct,
discourtesy to the public" is punishable by reprimand to 1-day suspension for the first offense,
reprimand to 5-day suspension for the second offense and 5-day suspension to removal for the
third offense. Defendant exhibit E. Given that the plaintiff was never given the first offense
conduct, the court can find no evidence the plaintiff even knew his conduct was considered to be

## V. Conclusion

The AJ found that the plaintiff "resented having to compete with women in the workplace and he had no reservations about voicing that resentment at work. Under the guise of eradicating what he purportedly perceived to be disparate treatment in favor of women, the appellant made comments and took certain actions to openly and deliberately make his feelings about women known. His derogatory attitude toward women permeated his actions at the work place and went far beyond simple expression of opinion that he believed there was disparate treatment at work.

In particular, the appellant resented the fact that the supervisory positions in his section were all held by women." Initial Decision at 4-5. This court finds this conclusion to be against the substantial evidence presented at the hearing. Even if the plaintiff resents working with women, he is entitled to such resentment. By no stretch of the imagination can a dislike of working with women, even to the magnitude the AJ found, be wrangled into sexual harassment, even under the agency definition. Furthermore, the AJ failed in her conclusion to consider the statements of Edwards, Patton, Storey, and Hodge, four women who had no complaints about working with the plaintiff.

This court agrees with the AJ that the plaintiff became obsessed with Bishop. Initial Decision at 6. However, this court also finds that the plaintiff's complaints against Bishop

---

"rude" or "conduct unbecoming a federal employee" by his superiors. Furthermore, the Table lists sexual harassment as an offense punishable by reprimand to 10-day suspension for the first offense.

were all founded in good cause. This court is unable to reconcile the AJ's finding that the plaintiff was obsessed with Bishop with her refusal to consider whether the plaintiff's complaints about Bishop were well founded. The AJ further ignored the evidence in the record that Bishop was being investigated for the complaints made by the plaintiff and therefore had reason to want the plaintiff fired. Furthermore, Bishop's own testimony demonstrated a resentment that she could not work from the Gadsden office because plaintiff brought to the attention of their superiors that this was not allowed. Thus, this court finds the AJ's characterization of plaintiff's March 1996 EEO complaint against Bishop as a "culmination of his campaign against her" to be arbitrary and against the substantial evidence in the record. *See* Initial Decision at 6.

It is therefore **ORDERED** by the court that the defendant's motion to dismiss, or in the alternative, motion for summary judgment, be and hereby is **DENIED**. It is further **ORDERED** by the court that the MSPB decision, upholding the termination of plaintiff, found by this court to be arbitrary, capricious and against the substantial weight of the evidence, be and hereby is **REVERSED** and the defendant agency is **ORDERED** to reinstate the plaintiff, effective immediately, and pay the plaintiff all back pay due.

**DONE** and **ORDERED** this the ____*3*____ day of <u>February</u>, 2000.


INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE

67